UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X

ENERGY INTELLIGENCE GROUP, INC. and
ENERGY INTELLIGENCE GROUP (UK)
LIMITED,

                  Plaintiffs,

      - against -

COWEN AND COMPANY, LLC,

                Defendant.

-----------------------------------X

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
DOC #:_____
DATE FILED: 7/15/16

**MEMORANDUM AND ORDER**

14 Civ. 3789 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiffs Energy Intelligence Group, Inc. and Energy Intelligence Group (UK) Limited (collectively, "plaintiffs" or "EIG") bring this copyright infringement action against defendant Cowen and Company, LLC ("Cowen"), alleging Cowen's liability for the unauthorized internal email forwarding of EIG's copyrighted publications.  Plaintiffs seek to hold Cowen liable for not only Cowen's own copyright infringement, but also the alleged infringing activities of Dahlman Rose & Company LLC ("Dahlman") undertaken prior to a transaction in which Dahlman was acquired by Cowen's parent company, which then assigned most of Dahlman's assets to Cowen (the "Cowen-Dahlman transaction").

Presently before the Court are cross-motions for partial summary judgment solely on the issue of successor liability.  For

the following reasons, we conclude that Cowen did not expressly assume liability for the instant copyright infringement claims, and that Cowen is not liable as Dahlman's successor under the de facto merger doctrine.  Therefore, defendant's motion for partial summary judgment is granted, and plaintiffs' cross-motion is denied.

## I. BACKGROUND[1]

### A. The Parties

Plaintiffs publish newsletters relating to the global energy industry.  Cowen 56.1 ¶ 18.  They sell subscriptions to bankers, investors, traders, and analysts with an interest in the oil and gas industries.  EIG Mem. 1.

Dahlman was a boutique investment bank and broker-dealer specializing in the marine shipping and energy industries.  Cowen 56.1 ¶ 1.  Dahlman's analysts subscribed to over 70 research publications, including three EIG publications: Oil Daily,

---

[1]     Factual background is drawn from the following sources: (1) Cowen's Rule 56.1 Statement of Undisputed Facts ("Cowen 56.1"); (2) EIG's Response to Defendant's Rule 56.1 Statement of Undisputed Facts and Counterstatement of Undisputed Material Facts ("EIG 56.1"); (3) the Affidavit of Robert Brinberg in support of defendant's motion ("Brinberg Aff."); (4) the Affidavit of Owen Littman, Esq. in support of defendant's motion ("Littman Aff.") and the exhibits attached thereto; (5) the Declaration of Demian A. Ordway in support of defendant's motion ("Ordway Decl.") and the exhibits attached thereto; (6) the Declaration of Derrick Dent in support of plaintiffs' motion ("Dent Decl.") and the exhibit attached thereto; and (7) the Declaration of Stephen M. Ankrom in support of plaintiffs' motion ("Ankrom Decl.") and the exhibits attached thereto.  Unless otherwise noted, the facts recited are undisputed.  We also refer to the parties' legal memoranda submitted in support of their motions as their "Mem." or "Reply" as appropriate.

<u>Petroleum Intelligence Weekly</u>, and <u>Natural Gas Week</u>.  <u>Id.</u> ¶ 20; EIG 56.1 at 6 n.2.  Prior to the Cowen-Dahlman transaction, Dahlman was principally owned by REDS Management LLC ("REDS"), a wholly-owned subsidiary of the private equity firm Lovell Minnick Partners LLC ("Lovell Minnick").  Cowen 56.1 ¶ 2.

Cowen is a boutique investment bank and broker-dealer providing investment banking, research, and sales and trading services.  <u>Id.</u> ¶¶ 35, 36.  Its ultimate parent company is Cowen Group, Inc. ("Cowen Group"), a diversified financial services company.  <u>Id.</u> ¶ 36.  Both Cowen and Cowen Group are incorporated in Delaware.  <u>Id.</u> ¶¶ 31, 33.

**B.   Dahlman's Pre-Transaction Conduct**

Two exchanges with Dahlman are highlighted by EIG.

**1. June 2012**

On June 26, 2012, a Dahlman employee named Jessica Wung wrote to EIG Customer Service by email, requesting that the name and email address on Dahlman's <u>Oil Daily</u> subscription be changed to "Doug Garber" and "drco@drco.com."  Ankrom Decl. Ex. 4, at 3.  Gladys Infante, Account Services Coordinator at EIG, responded to Wung as follows:

> Regarding your request to change the email address on
> your existing email subscription please be advised we
> are unable to honor your request as we can no longer
> accept generic email addresses.  All email addresses
> must be an individual's address.  Therefore, we cannot
> change the existing email address.  In the past we have

```
allowed such addresses.  However, going forward we will
strictly enforce the policy.

Our copyright policy does not allow for generic emails.
Additionally,    our    publications    are    licensed    to
individual subscribers for their sole use and are priced
based   on   the   number   of   recipients   under   each
subscription.   "One  subscription  cannot  be  shared  by
electronic    means    among    multiple    readers,    and
publications cannot be forwarded to individuals who have
not paid for a subscription."  We send each subscriber
their respective publications directly to eliminate the
need for one party to forward the publications to other
subscribers.  This type of generic email address allows
for  the  practice  of  sharing  these  publications.   As
technology is advance [sic] with every passing day, we
are better able to track this type of activity.

We can change the name on the account but we will need
Mr. Garber's email address.
```

Id. at 2-3.  Wung responded with a request to change the account

to "Doug Garber" and "dgarber@drco.com," which Infante confirmed.

Id. at 1-2.  Later that day, Wung amended the request to "Ivan

Suleiman" and "isuleiman@drco.com."  Id. at 1.

**2. September 2012**

A similar episode occurred in September of 2012.  On September

11, 2012, a Dahlman research associate named J.B. Lowe wrote to

Infante, stating that he had not received Oil Daily, which had

been "forwarded from Jessica [Wung] but she left the firm."  Ordway

Decl. Ex. 5, at 2.   Infante responded that the Oil Daily

subscription had been cancelled for non-payment, and that the

subscriber of record was Ivan Suleiman, who, Lowe later noted, had

also left Dahlman.  Id. at 1.  An EIG account manager named Derrick

Dent affirms that on September 14, he spoke with Lowe by telephone and "explained to Mr. Lowe that Dahlman Rose had a single-copy subscription for Oil Daily, and[,] therefore, that publication could not be copied and forwarded." Dent Decl. ¶ 5.  On September 21, 2012, Dent sent an email to Lowe, Danielle Drew (Assistant Vice President for Corporate Services and Administration at Dahlman) and James Crandell (Managing Director and Head of Oilfield Services Research at Dahlman), stating in relevant part that:

> Unfortunately, the license agreement only allows for one reader and the publication cannot be forwarded to others. . . .
>
> . . . . A single-user subscription is intended solely for the designated named recipient and not anyone else or an entire organization or a group within it and is priced accordingly.  Subscriptions cannot be shared by electronic means by forwarding or posting . . . .  If access to one or more of our publications is required by others beyond the current subscription agreement, a multiple named user subscription license could be purchased.  I would be happy to work with you on a subscription license that would meet your needs.

Dent Decl. Ex. A, at 1-2.  Crandell responded that "I am the only one who reads it.  Given I travel all the time it is easier to have my associate get it and fax/send me some relevant articles." Ordway Decl. Ex. 6, at 1.  Separately, Drew responded that the Oil Daily was being forwarded from Lowe to Crandall "because he travels[;] however, I have let him know that can no longer happen and he will be responsible for receiving it directly."  Dent Decl. Ex. A, at 1.

EIG alleges that, within minutes of assuring EIG that the <u>Oil Daily</u> subscription would not be shared beyond Crandell, Drew directed Dahlman's IT staff to auto-forward the subscription to Lowe. <u>See</u> Ankrom Decl. Ex. 7, at 10 ("There's a subscription, <u>Oil Daily</u>[,] that got all messed up and is now going to go to Crandell directly and needs to be forwarded to JB Lowe daily." (underlining added); <u>id.</u> at 2 ("[<u>Oil Daily</u>] is going to now come to you directly, rather than JB and it will be auto forwarded to who[m]ever needs to get it. . . .").

## C. The Cowen-Dahlman Transaction

In 2012, Dahlman was experiencing serious financial difficulties.[2] Lovell Minnick made efforts to sell Dahlman in the summer of 2012, but these efforts were unsuccessful. Cowen 56.1 ¶ 7. Cowen Group concluded that its broker-dealer, Cowen, was operating a complementary business to that of Dahlman, and that an integration of the firms would allow for the exploitation of

---

[2]    EIG purports to dispute this fact, EIG 56.1 at 2-4, but offers no supporting evidence. The undisputed evidence shows that, around the time of the Cowen-Dahlman transaction, Dahlman was experiencing serious financial difficulties. <u>See, e.g.</u>, Cowen 56.1 ¶¶ 3-13; Littman Aff. Ex. 21 (email from Cowen CEO Jeffrey Solomon stating that "[o]nce these guys pay bonuses they will lose their best folks unless they either 1)[ ]have a credible deal or 2) put in another 20mm"); Ordway Decl. Ex. 15, Brinberg Dep. 34:17-35:2, Sept. 1, 2015 (deposition testimony of Dahlman Chief Operating Officer Robert Brinberg stating that "Dahlman Rose had a substantial burn rate and if the company weren't sold in short order the alternative would have been bankruptcy or some other form of liquidation" and that "[w]e were losing more money than we were earning"); Littman Aff. Ex. 5, at 7 (joint Cowen and Dahlman presentation to FINRA stating that "Dahlman Rose is currently in a distressed financial situation" and that "[t]he Dahlman Rose franchise is only valuable to the extent that it stays intact and is absorbed quickly by a financially strong strategic investor"); <u>id.</u> at 6 (showing Dahlman's net capital and equity decreasing precipitously between 2010 and 2012).

synergies without loss of revenue.  Id. ¶¶ 50-51.  On December 20, 2012, Cowen Group made an initial offer to acquire Dahlman.  Id. ¶ 53.  On January 11, 2013, Cowen Group, Dahlman, and REDS entered into an exclusivity agreement providing for 30 days of exclusive negotiations.  Id. ¶ 54.

Starting in late December of 2012, Cowen Group conducted a due diligence review of Dahlman, with the principal goal of understanding Dahlman's assets and liabilities and the potential value of integrating the firms' businesses.  Id. ¶¶ 55-56.  The due diligence included a review of a wide variety of materials.  Id. ¶ 61; see Littman Aff. Ex. 2.  Cowen asserts that the due diligence confirmed that Dahlman was "imminently bankrupt," had negative equity, no book value, and high fixed costs.  Cowen 56.1 ¶ 60; see Littman Aff. ¶ 17.  EIG disputes this statement, pointing to evidence that Dahlman's net equity at this time was between $3.8 and $7.7 million.  EIG 56.1 at 16-17.  The parties also dispute whether Dahlman's subscription agreements with EIG were produced to Cowen Group or otherwise available to Cowen Group in the due diligence "data room."  See Cowen 56.1 ¶¶ 62-63, 66; EIG 56.1 at 17-18, 21-22.  It is undisputed, however, that Cowen Group requested information regarding "all significant suits, actions, [or] litigations . . . pending or threatened, affecting [Dahlman or REDS] or their business or operations," Littman Aff. Ex. 2 § 9.1, and that, in response, no mention was made of litigation

relating to EIG's publications, see Littman Aff. Ex. 3.   Owen
Littman, Cowen Group's General Counsel, affirms that "[t]o my
knowledge, no one at Dahlman Rose communicated anything to anyone
at Cowen Group concerning any potential claim or liability to EIG
during due diligence."   Littman Aff. ¶ 16.   Similarly, Robert
Brinberg, Dahlman's Chief Operating Officer and the "primary point
of contact at Dahlman Rose for the due diligence," Binberg Aff. ¶
2, affirms that during the negotiation and due diligence, he "never
had any communications . . . with anyone at Cowen Group . . .
regarding any potential lawsuit, liability, obligation, or
contingency arising out of or related to Dahlman Rose's
subscriptions to publications associated with Energy Intelligence
Group" and that he "was not aware of any such potential lawsuit,
liability, obligation, or contingency."   Id. ¶ 4.[3]

The Cowen-Dahlman transaction proceeded in two steps.   Cowen
56.1 ¶ 68.   First, Cowen Group formed an indirect subsidiary called
Cowen DR Acquisition Company LLC ("Cowen DRA"), which acquired all
of Dahlman's stock in exchange for Cowen Group stock, a potential
cash dividend, and the assumption of certain liabilities of REDS
relating to Dahlman.   Id. ¶ 69.   Second, Dahlman, now a subsidiary
of Cowen Group, assigned most of its assets to Cowen; in exchange,

---

[3]     Plaintiffs dispute Brinberg's statement, in part by asserting, without
elaboration, that there are "credibility issues."  EIG 56.1 at 20.   We note
that plaintiffs deposed Brinberg two months after he swore to the above-
referenced affidavit.  See Ankrom Decl. Ex. 48.

Cowen would assume, _inter alia_, Dahlman's "known liabilities, contingencies, and obligations." _Id._ ¶ 70.

Cowen asserts that this two-step structure was driven by Dahlman's financial condition and its understanding of the applicable regulatory backdrop. Specifically, a one-step transaction in which Cowen acquired more than 25% of Dahlman's assets would have triggered a requirement for FINRA pre-approval, a process that could take up to 180 days. Cowen 56.1 ¶¶ 77-78; _see_ NASD Rules 1017(a)(3) & (c)(3). Cowen believed Dahlman would not survive this waiting period without becoming insolvent or losing key employees that made it an attractive acquisition target. Cowen 56.1 ¶ 79; _see_ _supra_ n.2. In contrast to an asset sale, a "change in equity ownership" only required an application to FINRA with 30 days' prior notice, and the change could be effected without pre-approval. Cowen 56.1 ¶¶ 75-76; _see_ NASD Rules 1017(a)(4) & (c)(1).[4]

In a conference call of January 29, 2013, Dahlman, REDS, and Cowen Group explained the proposed two-step structure of the Cowen-Dahlman transaction to FINRA representatives. Cowen 56.1 ¶ 98; _see_ Littman Aff. Ex. 5. Dahlman submitted two "Continuing Member Applications" to FINRA: the first seeking approval for a change in its equity ownership, _see_ Ankrom Decl. Ex. 43, and the second

---

[4]     EIG disputes Cowen's statements explaining the rationale for the two-step transaction, EIG 56.1 at 24-26, but offers no alternative account.

seeking authorization of the sale of more than 25% of its assets, see Littman Aff. Ex. 11.

## 1. The Purchase and Sale Agreement

The first step of the Cowen-Dahlman transaction -- the purchase of Dahlman's stock in exchange for Cowen Group's stock -- was effected through a Purchase and Sale Agreement among Cowen Group, Cowen DRA, REDS, and Dahlman. See Littman Decl. Ex. 6 (the "PSA"). The PSA was dated February 1, 2013, and its closing was conditioned on the submission of the appropriate FINRA application and observance of the required 30-day waiting period. PSA § 8.1(a).

The PSA contained various representations by REDS and Dahlman concerning Dahlman's liabilities, including that: (1) its business was conducted in compliance with applicable law, PSA § 2.9(a); (2) there were no legal claims "pending or . . . threatened in writing" alleging that Dahlman's business "infringes, misappropriates or violates the Intellectual Property rights of any person," PSA § 2.13(f); (3) Dahlman did not have "any material indebtedness or liability, absolute or contingent, known or unknown" which was not disclosed in an attached balance sheet and "Seller Disclosure Schedule," PSA § 2.7; and (4) no legal claims were pending or threatened in writing against Dahlman except as listed in Schedule 2.16 of the Seller Disclosure Schedule, PSA § 2.16. The Seller Disclosure Schedule, Littman Aff. Ex. 8, contained a balance sheet

at Schedule 1.6(a) and the list of pending litigations at Schedule 2.16.   Neither the balance sheet, Schedule 2.16, the Seller Disclosure Schedule, nor the PSA in general makes any mention of EIG or any pending or threatened copyright infringement claims.

Dahlman received no objection from FINRA in the 30 days following its submission of the first application, and the PSA closed on March 11, 2013.[5]   Cowen 56.1 ¶ 113.   That day, Dahlman was renamed Cowen Securities LCC.[6]   Id. ¶ 115.

### 2. The Assignment and Assumption Agreement

The second step of the Cowen-Dahlman transaction was effected through an Assignment and Assumption Agreement between Cowen and Dahlman.   See Littman Aff. Ex. 9 (the "AAA").   The AAA was executed on March 11, 2013, the same day the PSA closed.   The AAA provided for conveyance by Dahlman to Cowen of its right, title, and interest in its assets, with the exception of certain excluded assets (namely, $1,000,000 of cash or cash equivalents and Dahlman's books and records).   AAA § 2.1; id. § 1 (defining "Excluded Assets").   As consideration for those assets, Cowen would assume: (a) "all known liabilities, contingencies and obligations arising out of or relating primarily to the conduct or operation

---

[5]    The PSA was amended twice to reduce the consideration paid for Dahlman's stock.   Ultimately, the consideration paid in Cowen Group stock was reduced from $10 million to less than $7 million, and no cash dividend or stock option was paid.   Cowen 56.1 ¶¶ 110-112.

[6]    For ease of reference, we continue to refer to Cowen Securities, LLC as "Dahlman."

of" Dahlman's business and (b) "all liabilities, obligations and duties to perform any and all" pre-existing contracts.  Id. § 2.3. All of Dahlman's liabilities other than these assumed liabilities, defined as "Excluded Liabilities," would remain with Dahlman.  Id.

Mr. Littman, Cowen Group's General Counsel, asserts that he had complete drafting control over the AAA, and that he intended the phrase "known liabilities, contingencies, and obligations" in Section 2.3(a) of the AAA to refer to the obligations listed in the Seller Disclosure Schedule annexed to the PSA.  Littman Aff. ¶ 28.  Jeffrey M. Solomon, Cowen Group's CEO, signed the AAA for both parties to the transaction.  AAA at 9.

**D. Business Integration**

Following the closing of the PSA and execution of the AAA on March 11, 2013, Cowen and Dahlman began to integrate their business operations.  As part of that integration, a number of emails were exchanged among Brinberg (Dahlman's Chief Operating Officer), Robert Fagin (Cowen's Head of Research), and Cowen library and IT personnel regarding how to handle the active research subscriptions of Dahlman's analysts.  Some of these emails refer to the use of "rules" to auto-forward certain subscriptions to the desired recipients, see Ankrom Decl. Exs. 27-34, although none specifically discusses auto-forwarding EIG publications.  However, a list of legacy Dahlman subscriptions including their cost, expiration date, and designated subscribers -- and which does list

EIG publications -- was communicated in March and April.   Ankrom
Decl. Exs. 34, at 5, 35A, at 2.   A March 26 email authorized the
renewal of <u>Petroleum Intelligence Weekly</u>, which subscription had
been suspended by EIG for non-payment, Littman Aff. Ex. 32, and a
March 27 email discussed the renewal of <u>Natural Gas Week</u>, Ankrom
Decl. Ex. 35 at 1.   Additionally, it is undisputed that on April
3, 2013, an issue of <u>Oil Daily</u> was forwarded from James Crandell's
email account to other Dahlman research analysts.   Cowen 56.1 ¶
130.   However, in sworn statements, Cowen's CEO,[7] Head of Research,[8]
and Co-Director of Research[9] all deny knowing that Dahlman
personnel had been auto-forwarding EIG publications.

In a single letter dated May 2, 2013, FINRA approved both
applications made in connection with the transaction.   <u>Id.</u> ¶ 138.
Through May, Cowen continued to integrate Dahlman's businesses and
employees with its own.   <u>See</u> <u>Id.</u> ¶¶ 139-40.   The parties dispute
precisely how and when employees moved from Dahlman to Cowen.   <u>See</u>
EIG 56.1 at 45.   It appears that most Dahlman employees ultimately
moved to Cowen, but Dahlman's executive management did not.   <u>See</u>
Cowen 56.1 ¶¶ 45, 118, 146.

On May 31, the AAA closed and was memorialized by a Bill of
Sale that Cowen and Dahlman executed on that day.   <u>See</u> Littman

---

[7]      <u>See</u> Ordway Decl. Ex. 14, Solomon Dep. 51:25–53:19, Aug. 28, 2015.

[8]      <u>See</u> Ordway Decl. Ex. 13, Fagin Dep. 103:25–104:13, Aug 19, 2015.

[9]      <u>See</u> Ordway Decl. Ex. 12, Reilly Dep. 71:25–72:13, Aug. 6, 2015.

Aff. Ex. 16.   On June 1, 2013, Dahlman relinquished its broker-dealer registration with FINRA.   Cowen 56.1 ¶ 147.   Dahlman maintained more than $2 million of net capital until at least June 26, 2013, and then about $400,000 of net capital for some time thereafter.   Id. ¶ 148; see Littman Aff. Ex. 17 (June 26, 2013 letter from Dahlman notifying FINRA that Dahlman intended to return $2 million of capital to Cowen Group, leaving estimated excess net capital of $400,000).   Dahlman is not currently operating, but it remains a corporation in good standing with its own books and records.   Cowen 56.1 ¶ 149.

**E. EIG's Demand Letter**

EIG, through counsel, notified Cowen of the instant copyright infringement claim in a demand letter addressed to Littman dated March 3, 2014.   Littman Aff. Ex. 18.   EIG wrote that "[i]t has recently come to our attention that Cowen has been infringing EIG's federally-registered copyrights in the newsletter Oil Daily by making and distributing unlawful copies of Oil Daily on a regular and continuing basis."   Id. at 1.   EIG attached a draft complaint and demanded that Cowen, among other things, preserve documents and investigate its employees' conduct and "any records from its predecessor-in-interest" in advance of a meeting to "explore a possible business resolution to this matter."   Id. 1-2.

## F. Procedural History

On May 28, 2014, EIG filed its complaint in this Court.  At a conference of April 15, 2015, we ordered discovery and briefing solely on the issue of Cowen's purported successor liability for Dahlman's alleged copyright infringement.  The parties filed cross-motions for partial summary judgment, and briefing was completed November 18, 2015.  The Court heard oral argument on June 14, 2016.[10]  On June 22, we received an unsolicited letter from EIG responding to questions that arose at oral argument. Cowen responded by a letter dated June 29.


## II. DISCUSSION

### A. Legal Standard

A motion for summary judgment is appropriately granted when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  In ruling on a summary judgment motion,

---

[10]    On May 11, 2016, Cowen moved to disqualify the law firm of Powley & Gibson, P.C., as counsel to EIG.  In a telephone conference of May 19, we ordered full briefing of the disqualification motion and, to avoid any issue should the disqualification motion be granted, directed the law firm of Smith, Gambrell & Russell, LLP, co-counsel to EIG, to orally argue the pending cross-motions.  We resolve the disqualification motion in a separate Memorandum and Order filed today.

"the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted).  When parties cross-move for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001).

**B. Governing Law**

"Under both New York law and traditional common law, a corporation that purchases the assets of another corporation is generally not liable for the seller's liabilities."  New York v. Nat'l Serv. Indus., Inc., 460 F.3d 201, 209 (2d Cir. 2006). However, there are four exceptions:

> a buyer of a corporation's assets will be liable as its successor if: "(1) it expressly or impliedly assumed the predecessor's tort liability, (2) there was a consolidation or merger of seller and purchaser, (3) the purchasing corporation was a mere continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape such obligations."

Id. (quoting Schumacher v. Richards Shear Co., 59 N.Y.2d 239, 245, 451 N.E.2d 195 (1983)); accord Cargo Partner AG v. Albatrans, Inc., 352 F.3d 41, 45 (2d Cir. 2003).  The same general rule, and exceptions, exist under Delaware law.  See Elmer v. Tenneco Resins,

<u>Inc.</u>, 698 F. Supp. 535, 540 (D. Del. 1988); <u>Ross v. Desa Holdings</u> <u>Corp.</u>, No. 05C-05-013 MMJ, 2008 WL 4899226, at *4 (Del. Super. Ct. Sept. 30, 2008).

In seeking to hold Cowen liable for Dahlman's pre-transaction copyright infringement, EIG contends that (1) Cowen explicitly assumed this liability through the AAA, and (2) the AAA effected a <u>de facto</u> merger between Dahlman and Cowen.  Cowen argues that neither exception applies.

**C. Analysis**

**1. Express Assumption**

First, the parties cross-move for summary judgment on whether, through the AAA, Cowen expressly assumed liability for EIG's instant copyright claims against Dahlman.  We conclude that Cowen did not because EIG's claims against Dahlman could not reasonably be considered "known liabilities, contingencies, or obligations" on or before May 31, 2013, the day the AAA closed.

By its terms, the AAA is governed by New York law.  AAA § 7.2.  Under New York law, the question of whether a written contract is ambiguous is a question of law for the court.  <u>JA</u> <u>Apparel Corp. v. Abboud</u>, 568 F.3d 390, 396 (2d Cir. 2009).  "The key inquiry at this initial interpretation stage is whether the contract is unambiguous with respect to the question disputed by the parties."  <u>Int'l Multifoods Corp. v. Commercial Union Ins.</u> <u>Co.</u>, 309 F.3d 76, 83 (2d Cir. 2002).  "Under New York law, the

presence or absence of ambiguity is determined by looking within
the four corners of the document, without reference to extrinsic
evidence." Chapman v. N.Y. State Div. for Youth, 546 F.3d 230,
236 (2d Cir. 2008). "Contract language is ambiguous if it is
capable of more than one meaning when viewed objectively by a
reasonably intelligent person who has examined the context of the
entire integrated agreement." Collins v. Harrison—Bode, 303 F.3d
429, 433 (2d Cir. 2002) (internal quotation marks omitted). If
the contract is not ambiguous, the court should assign the plain
and ordinary meaning to each term, and it may then award summary
judgment. Int'l Multifoods, 309 F.3d at 83.

The AAA does not mention EIG or any liability, contingency,
or obligation to EIG. The relevant inquiry is therefore whether
the asserted copyright infringement liability was among "all known
liabilities, contingencies and obligations" of Dahlman that Cowen
expressly assumed in the AAA. The parties debate whether "known"
in the AAA means "known to Cowen," or "known to either Cowen or
Dahlman." This possible ambiguity, to the extent it exists, is
beside the point.[11] Given that EIG sent its first demand letter
in March of 2014, and never asserted its copyright infringement
claim against either Dahlman or Cowen before that, there is no

---

[11]    We do not reach Cowen's arguments that the undisputed extrinsic evidence
indicates that "known" means "known to Cowen," and that this is the only
commercially reasonable way to interpret the word "known" in this context. See
Cowen Mem. 12–15.

record evidence that either party to the transaction knew of a copyright-related liability, contingency, or obligation to EIG, on or before May 31, 2013.

EIG asserts that Dahlman knew of a "liability, contingency, or obligation" as a result of the June 2012 and September 2012 email exchanges between Dahlman personnel and EIG customer service.  We do not agree.  In these emails, EIG personnel explained that sharing publications was prohibited under the subscription agreement, apparently in a change from a prior policy of non-enforcement.  It is undisputed that in connection with the June and September 2012 episodes, EIG did not send a cease and desist letter or a demand letter.  It did not threaten a lawsuit, the termination of Dahlman's subscriptions, or any other adverse action.  Instead, EIG only sought to sell a multi-user subscription should Dahlman desire that multiple recipients receive Oil Daily. The existence of facts from which a claim could be crafted but which has not been asserted, even in the form of a demand letter, is too speculative to give rise to a known obligation.

The history of the due diligence underscores this conclusion. Cowen Group engaged in an extensive review of Dahlman's business. It received representations from Dahlman and REDS that no legal claims were pending or threatened in writing, and that the liabilities listed in the PSA's Seller Disclosure Schedule were exhaustive of all liabilities, known and unknown.  Even assuming

Cowen had access to the underlying EIG subscription agreements and was aware of those contracts, there is simply no evidence that Dahlman or Cowen knew of the legal claim for copyright infringement on or before May 31, 2013, the day the AAA closed.[12]

It is even doubtful that EIG itself had formulated its current copyright claim prior to May of 2013.  At oral argument, we inquired about the significant gap in time between September 2012 -- after the two conversations described at pages 3 to 6, supra -- and March of 2014, when EIG first asserted a copyright claim. In its letter of June 22, EIG explains that it relied on Dahlman's September 2012 representations that the publications would not be forwarded, and it was not until after yet another email exchange in August of 2013 involving James Crandell (by then an employee of Cowen) that EIG began to investigate in earnest.  Pls.' Ltr. of June 22, 2016, at 2-3; see id. at 3 ("EIG believes that during the period between September 2012 and August 2013 none of its employees concerned themselves with the possibility of infringement by [Dahlman]").  This explanation only proves the point.  If EIG did not know it had a claim against Dahlman, let alone articulate that

---

[12]     Perhaps aware of this difficulty, at oral argument, EIG stressed the term "known contingency," suggesting that, even if not a fully-formed liability, the possibility of consequences was known to Dahlman personnel who were previously admonished not to forward EIG publications but nevertheless chose to do so. This shift in rhetoric does not escape the underlying difficulty.  EIG's core assertion is that the financial risks associated with this legal proceeding, whether cast a "liability," "obligation," or "contingency," were known in 2012 and 2013.  But as we have explained, the mere availability of facts that, if pursued, could ripen into a claim or lawsuit, cannot fairly be viewed as giving notice of a legal risk to be allocated in a business contract.

claim, Dahlman or Cowen could not have known of a concomitant liability, contingency or obligation to EIG.[13]

We similarly reject EIG's contention that there is a triable issue of fact with respect to Cowen's knowledge of Dahlman's "liability, contingency, or obligation" to EIG because Cowen employees had access to the underlying subscription contracts during the due diligence and may have learned of Dahlman's general penchant for auto-forwarding subscriptions during the business integration.  These facts, even if known by Cowen personnel, are insufficient to provide even notice of a copyright <u>claim</u>, let alone an outstanding "liability, contingency, or obligation."

### 2. <u>De Facto</u> Merger

Second, the parties cross-move for summary judgment as to whether the transaction constituted a <u>de facto</u> merger between Cowen and Dahlman, rendering Cowen a successor to Dahlman's liabilities. "A <u>de facto</u> merger occurs when a transaction, although not in form a merger, is in substance 'a consolidation or merger of seller and purchaser.'"  <u>Cargo Partner</u>, 352 F.3d at 45 (quoting <u>Schumacher</u>, 59 N.Y.2d at 245, 451 N.E.2d at 198).  The purpose of the doctrine is to "avoid the patent injustice which might befall a party simply

---

[13]   A further indication can be found in EIG's privilege log, which lists documents withheld from discovery on the basis of attorney-client privilege. The log includes entries related to this case reflecting that EIG consulted with counsel in September of 2012, and not again until August of 2013.  <u>See</u> Ordway Decl. Ex. 9, at 1-3.  A reasonable inference from these entries is that EIG considered pursuing a claim in September of 2012, but did not.  In this context, any suggestion that Dahlman and Cowen were on notice is not tenable.

because a merger has been called something else." Id. at 46
(internal quotation marks and brackets omitted).

### a. Choice of Law

As an initial matter, the parties debate which law applies.
To decide, we apply the choice of law rules of New York, the forum
state. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496,
(1941). We first consider whether there is an actual conflict
between the laws of the relevant jurisdictions. Beth Israel Med.
Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d
573, 582 (2d Cir. 2006) (citing In re Allstate Ins. Co. (Stolarz),
81 N.Y.2d 219, 223, 613 N.E.2d 936 (1993)). An actual conflict
exists when the applicable law from each jurisdiction contains
different substantive rules whose differences are "relevant to the
issue at hand" and could possibly affect the outcome of the case.
Fin. One Pub. Co. v. Lehman Bros. Special Fin., 414 F.3d 325, 331
(2d Cir. 2005) (internal quotation marks omitted). If there is an
actual conflict, "'[t]he law of the jurisdiction having the
greatest interest in the litigation will be applied.'" GlobalNet
Financial.Com, Inc. v. Frank Crystal & Co., 449 F.3d 377, 384 (2d
Cir. 2006) (quoting Schultz v. Boy Scouts of Am., Inc., 65 N.Y.2d
189, 197, 480 N.E.2d 679, 684 (1985)) (brackets in GlobalNet).

### i. Conflict Analysis

We conclude that an actual conflict exists between New York
and Delaware law with respect to finding a de facto merger. New

York courts recognize a de facto merger doctrine and look to the following factors:

> (1) continuity of ownership; (2) cessation of ordinary business and dissolution of the acquired corporation as soon as possible; (3) assumption by the purchaser of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the acquired corporation; and (4) continuity of management, personnel, physical location, assets, and general business operation.

Priestley v. Headminder, Inc., 647 F.3d 497, 505 & n.3 (2d Cir. 2011) (quoting Nat'l Serv. Indus., 460 F.3d at 209).  Of these factors, "'continuity of ownership is the essence of a merger' . . . and the doctrine of de facto merger cannot apply in its absence."  Id. at 505-06 (quoting Nat'l Serv. Indus., 460 F.3d at 211).

Delaware courts also recognize a de facto merger doctrine.

> The elements necessary to create a de facto merger under Delaware law are the following: (1) one corporation transfers all of its assets to another corporation; (2) payment is made in stock, issued by the transferee directly to the shareholders of the transferring corporation; and (3) in exchange for their stock . . . the transferee agree[s] to assume all the debts and liabilities of the transferor.

Magnolia's at Bethany, LLC v. Artesian Consulting Eng'rs, Inc., No. S11C-04-013-ESB, 2011 WL 4826106, at *3 (Del. Super. Ct. Sept. 19, 2011) (citing Drug, Inc. v. Hunt, 35 Del. 339, 361-62, 168 A. 87, 96 (1933)); see also Spring Real Estate, LLC v. Echo/RT Holdings, LLC, No. 7994-VCN, 2013 WL 6916277, at *4 (Del. Ch. Dec.

31, 2013); <u>Marnavi S.p.A. v. Keehan</u>, 900 F. Supp. 2d 377, 397 (D. Del. 2012).

Comparing these formulations and the cases applying them, we discern an actual conflict between New York and Delaware's <u>de facto</u> merger doctrines.  First, the elements of a <u>de facto</u> merger in Delaware are clearly more rigorous: they require a transfer of <u>all</u> of the transferor's assets and an assumption of <u>all</u> its liabilities, in exchange for a payment made in the <u>stock</u> of the transferee <u>directly</u>[14] to the shareholders of the transferor.[15]

---

[14]   A series of decisions in this district articulate a Delaware-New York conflict on the basis that, while each state demands continuity of ownership, Delaware law requires that shareholders of the selling corporation acquire a <u>direct</u> ownership interest in the alleged successor, while New York courts accept an allegation that shareholders of the selling corporation received an <u>indirect</u> interest in the assets.  <u>See</u> <u>Tommy Lee Handbags Mfg. Ltd. v. 1948 Corp.</u>, 971 F. Supp. 2d 368, 379 (S.D.N.Y. 2013); <u>SungChang Interfashion Co. v. Stone Mountain Accessories, Inc.</u>, No. 12 Civ. 7280(ALC)(DCF), 2013 WL 5366373, at *14 (S.D.N.Y. Sept. 25, 2013); <u>Hayden Capital USA, LLC v. Northstar Agri Indus., LLC</u>, No. 11 Civ. 594(DAB), 2012 WL 1449257, at *4 (S.D.N.Y. Apr. 23, 2012).  <u>Compare</u> <u>In re New York City Asbestos Litig.</u>, 15 A.D.3d 254, 256, 789 N.Y.S.2d 484, 486-87 (1st Dep't 2005), <u>with</u> <u>Magnolia's</u>, 2011 WL 4826106, at *3.

[15]   Plaintiffs call our attention to one Delaware court that has cast doubt on whether the elements drawn from <u>Drug, Inc.</u> must all be rigorously met in order to find a <u>de facto</u> merger.  <u>See</u> <u>Xperex Corp. v. Viasystems Techs. Corp., LLC</u>, No. 20582-NC, 2004 WL 3053649, at *2 (Del. Ch. July 22, 2004) ("<u>Drug, Inc. v. Hunt</u>, in my opinion, did not set forth the only circumstances in which a Delaware corporation will be considered the successor of another corporate entity.").  In <u>Xperex</u>, the Chancery Court denied a motion for summary judgment seeking a ruling that a transaction was not <u>de facto</u> merger, even though it was undisputed that: (1) there was no direct transfer from alleged predecessor to successor; (2) the alleged successor did not issue stock to the shareholders of the predecessor; and (3) the alleged successor did not agree to assume the predecessor's liabilities.  <u>Id.</u>  Plaintiffs contend <u>Xperex</u> suggests a <u>de facto</u> merger doctrine that is broader and more like New York's, in support of their argument that no actual conflict of law exists.  EIG Reply 5-6.  We disagree.  Instead, Chancellor Chandler explained his decision was rooted in Delaware law's "recognized concern for transactions that seek to shelter assets from creditors."  <u>Xperex</u>, 2004 WL 3053649, at *2 ("[T]his Court is one of equity and will not allow sham transactions to achieve mischief.").  As we discuss <u>infra</u>, there is no allegation here of a "sham transaction," and the equitable considerations favor Cowen, not EIG.

Second, Delaware courts are generally hesitant to apply the <u>de facto</u> merger doctrine without an allegation that the corporation intended to defraud or otherwise harm creditors.  <u>See</u>  <u>Fehl v. S. W. C. Corp.</u>, 433 F. Supp. 939, 947 (D. Del. 1977) ("In general, no liability has been found under a de facto merger theory so long as the transfer was in the ordinary course of business and the seller received and held consideration."); <u>Heilbrunn v. Sun Chem. Corp.</u>, 146 A.2d 757, 760 (Del. Ch. 1958) ("Plaintiffs . . . may not complain of a corporate purchase made in conformity with Delaware statutory authority unless such transaction is fraudulent as having been carried out for a grossly inadequate consideration or otherwise made in bad faith."), <u>aff'd</u> 150 A.2d 755 (Del. 1959); <u>Bryant, Griffith & Brunson, Inc. v. Gen. Newspapers</u>, 178 A. 645, 648 (Del. Super. Ct. 1935) (concluding transfer of assets, in the absence of fraud or other equitable considerations, does not constitute <u>de facto</u> merger).  Both of these differences follow logically from the fact that Delaware law is generally more deferential to the formalities of a transaction and the choice of corporate form.

As a result, Delaware courts use the <u>de facto</u> merger doctrine "sparingly," <u>Me. State Ret. Sys. v. Countrywide Fin. Corp.</u>, No. 2:10-CV-0302 MRP, 2011 WL 1765509, at *3 (C.D. Cal. Apr. 20, 2011) (collecting cases), and "only in very limited contexts," <u>Binder v. Bristol-Myers Squibb, Co.</u>, 184 F. Supp. 2d 762, 769 (N.D. Ill.

2001).  See 1 R. Franklin Balotti & Jesse A. Finkelstein, The Delaware Law of Corporations and Business Organizations § 9.3 (3d ed. 2016), 2006 WL 2453636.  The parties have not presented, and we have not found, a Delaware case finding a de facto merger since Drug, Inc. in 1933.  In contrast, New York courts have more readily sustained claims of a de facto merger, even if not all elements are alleged and without an allegation of intentional fraud.  See Fitzgerald v. Fahnestock & Co., 286 A.D.2d 573, 574–75, 730 N.Y.S.2d 70, 71–72 (1st Dep't 2001).  This difference is an actual conflict.  See Allstate Ins. Co. v. Countrywide Fin. Corp., 824 F. Supp. 2d 1164, 1171–72 (C.D. Cal. 2011) (finding conflict between New York and Delaware law).

Plaintiffs offer no authority concluding that no actual conflict exists.[16]  Moreover, they simultaneously insist both that there is no conflict and that New York law must be applied, presenting a logical difficulty.[17]  Since we conclude that a conflict of law exists, we next turn to an interest analysis.

---

[16]  Plaintiffs point to one court concluding that there was no meaningful conflict between New York and Delaware law as to whether compliance with the applicable asset sale statute is a requisite element for a de facto merger claim.  MBIA Ins. Corp. v. Countrywide Home Loans, Inc., 40 Misc. 3d 643, 652, 965 N.Y.S.2d 284 (Sup. Ct. 2013).  That court, however, explicitly declined to address the conflicts we discuss here because the parties did not raise them.  Id. at 653 n.6.

[17]  At oral argument, plaintiffs advanced a different position: that New York law should be applied "not because there is a conflict," but because "New York law is more developed on the topic."  Oral Arg. Tr. ("Tr.") 49:10–20, June 14, 2016.  This approach was suggested without the benefit of supporting authority. We disagree both that Delaware law is "less developed" on the topic and that such a judgment should control a choice of law analysis in this context.

## ii. Interest Analysis

"[T]he facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." Kalb, Voorhis & Co. v. Am. Fin. Corp., 8 F.3d 130, 132 (2d Cir. 1993) (citing Intercont'l Planning, Ltd. v. Daystrom, Inc., 24 N.Y.2d 372, 248 N.E.2d 576, 582 (1969)). Under the internal affairs doctrine, issues involving the rights and liabilities of a corporation are generally governed by the law of the state of incorporation, based on the rationale that corporations are creatures of the state and are intentionally incorporated in a particular place in order to organize their liabilities. See Restatement (Second) Conflict of Laws § 302. We follow that rule here, as have numerous courts choosing law on issues of corporate veil piercing,[18] successor liability,[19] and de facto mergers.[20]  EIG's suggestion that this is an "unusual case"

---

[18]    See Kalb Voorhis, 8 F.3d at 132 ("'Because a corporation is a creature of state law whose primary purpose is to insulate shareholders from legal liability, the state of incorporation has the greater interest in determining when and if that insulation is to be stripped away.'" (quoting Soviet Pan Am Travel Effort v. Travel Comm., Inc., 756 F. Supp. 126, 131 (S.D.N.Y. 1991)); McCall v. Chesapeake Energy Corp., 817 F. Supp. 2d 307, 314 n.8 (S.D.N.Y. 2011); Sykes v. Mel Harris & Assocs., LLC, 757 F. Supp. 2d 413, 430 (S.D.N.Y. 2010) ("Generally, the veil-piercing analysis is governed by the law of the place of incorporation.").

[19]    See U.S. Fid. & Guar. Co. v. Petroleo Brasileiro S.A.-Petrobras, No. 98 Civ. 3099(THK), 2005 WL 289575, at *5 (S.D.N.Y. Feb. 4, 2005) ("The question of successor liability in this proceeding . . . should be governed by the law of . . . the jurisdiction of the relevant entities' incorporation."); Planet Payment, Inc. v. Nova Info. Sys., Inc., No. 07-cv-2520(CBA)(RML), 2011 WL 1636921, at *7 (E.D.N.Y. Mar. 31, 2011).

[20]    See Tommy Lee Handbags, 971 F. Supp. 2d at 379; SungChang Interfashion, 2013 WL 5366373, at *15; Hayden Capital, 2012 WL 1449257, at *4; Allstate Ins.

in which the greater interest of another state overrides this default rule, <u>see</u> Restatement (Second) Conflict of Laws § 302(2), is unpersuasive, particularly because all the players in this litigation -- including Cowen Group, Dahlman, Cowen DRA, and plaintiff Energy Intelligence Group, Inc. -- are also Delaware entities. <u>See</u> Cowen 56.1 ¶¶ 16, 31, 33, 83, 116; EIG 56.1 at 5, 9, 27, 38. Thus, because Cowen is a Delaware corporation, we apply Delaware law.

### b. Analysis Under Delaware Law

Applying Delaware law, the Cowen-Dahlman transaction clearly was not a <u>de facto</u> merger. First, the elements of a <u>de facto</u> merger are not met. The AAA, which EIG claims effected a merger between Cowen and Dahlman, did not involve a receipt of Cowen's stock by Dahlman or its shareholders.[21] Nor did the AAA facilitate a transfer of all assets; indeed, the AAA by its terms excluded $1,000,000 in assets from the transaction, leaving it with Dahlman. Later, the evidence indicates, Dahlman had net capital equal to amounts ranging from $2,400,000 and $400,000. Similarly, Cowen

---

<u>Co. v. Countrywide Fin. Corp.</u>, 824 F. Supp. 2d at 1173 ("[A]pplying Delaware law to <u>de facto</u> merger questions will allow Delaware to provide its corporations with one bright-line rule rather than subjecting them to the vagaries of multiple states' rules.").

[21]   To the extent that the first step of transaction, effected by the PSA, involved a transfer of stock, that was the stock of Cowen Group, not Cowen. Moreover, the first step of the transaction lacked "continuity of ownership," as ownership of Dahlman changed hands from REDS to Cowen Group.

did not agree to assume all debts and liabilities of Dahlman, as the AAA carved out certain "Excluded Assets."

Second, there is no allegation of fraud or inadequate consideration. Under the AAA, Cowen received certain Dahlman assets in exchange for assuming certain liabilities. Even if EIG could legitimately be considered a creditor of Dahlman at the time, EIG does not allege that this transaction was substantively unfair, or that it was intended to defraud or avoid liability to EIG. Tr. 44:22-45:5. We appreciate that, at the time the AAA was executed, Dahlman and Cowen were both subsidiaries of Cowen Group. EIG contends that, as a result, there was "no change in ultimate ownership," indicating the continuity of ownership crucial to finding a de facto merger. EIG Mem. 27-28. The parties agree there is no caselaw in Delaware or New York applying the de facto merger doctrine to this context of an assignment and assumption agreement between two affiliated parties. Generally, however, Delaware law respects the separate legal existence of corporate entities, even when under common ownership and control. See Allied Capital Corp. v. GC-Sun Holdings, L.P., 910 A.2d 1020, 1038 (Del. Ch. 2006); Stauffer v. Standard Brands Inc., 178 A.2d 311, 316 (Del. Ch. 1962) ("In the absence of fraud, the separate entity of a corporation is to be recognized."). It follows that, to the extent such a transaction involves adequate consideration, the assignment of assets in exchange for assumption of liabilities,

even between affiliates, is tantamount to a sale of those assets for cash.  Even under New York law, a cash transaction generally precludes finding a de facto merger because it indicates a lack of continuity of ownership and does not prejudice creditors of the seller.  See Lewis v. Blackman Plumbing Supply L.L.C., 51 F. Supp. 3d 289, 313-14 (S.D.N.Y. 2014) (citing cases).

Third, none of the equitable concerns that animate the de facto merger doctrine are present here.  As noted, the evidence does not suggest that anyone at Cowen knew about this specific liability to EIG or structured the transaction to avoid paying EIG.  Moreover, recognizing successor liability in this context would subject Cowen to liability in an amount (according to EIG's calculations and demand) much greater than EIG could have received in a suit against Dahlman, given that it is many times what Dahlman was worth in total at the time of the Cowen-Dahlman transaction, even under EIG's more favorable estimates.  The de facto merger doctrine is aimed at substantive fairness and preventing the "patent injustice which might befall a party simply because a merger has been called something else."  Cargo Partner, 352 F. 3d at 46 (internal quotation marks omitted).  To apply it here would be to stray outside that equitable purpose.  We therefore conclude as a matter of law that there was not a de facto merger between Cowen and Dahlman.

## III. CONCLUSION

For the foregoing reasons, we conclude that Cowen did not expressly assume liability for Dahlman's alleged pre-transaction copyright infringement, and that Cowen is not Dahlman's successor under the de facto merger doctrine. Accordingly, defendant's motion for partial summary judgment, ECF No. 51, is granted, and plaintiffs' cross-motion, ECF No. 66, is denied.

The parties are directed to confer and submit a proposed case management plan to conclude the remainder of the case.

**SO ORDERED.**

Dated:   New York, New York
         July 15, 2016

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

31